Robert Freeman here on behalf of the appellants who are police officers from the North Las Vegas Police Department. I understand from an order I received last week, maybe the week before, that you would like me to address jurisdiction, whether this court has jurisdiction to determine this case. And I agree that in the ordinary course, a denial of a request for qualified immunity that's based upon what the district court calls a genuine issue of material fact would divest you of jurisdiction. However, under the Scott v. Harris Supreme Court case, I would submit that you do have jurisdiction to determine whether the fact issue as defined by the district court actually is a genuine issue of material fact. And in fact, this court has cited Harris and used that exception to an ordinary jurisdictional ruling several times. In fact, Justice Tshima wrote the decision in a case that I think is very similar to this fact pattern last year. It's a case that I did not cite in the brief, but I provided a citation to counsel and I provided it to the court. It is a case called Wilkinson v. Torres, and it's found at 610 F. 3rd 546. It's a Ninth Circuit case from 2010. In Wilkinson v. Torres, the facts are very similar to these facts. In that case, the police officer observed a van in front of a drug house. He was suspicious, so he ran the van's license plate and found out that the van was stolen. He initiated a chase. He called for backup. That chase culminated in a couple of pit maneuvers, which drove the van into the yard, into a private front yard. The van tried to get out of the yard. It was blocked by a third police vehicle. The two primary pursuing police officers exited their vehicle and approached the van. As they did so, the van backed up, and from the perspective of one of the police officers, Officer Torres, he felt that the van ran over the other officer, Officer Key. The van stopped again, and when the van started up again and tried to move backwards, Officer Torres shot the van driver and killed the van driver. Officer Torres asked for qualified immunity, which was denied by the district court. On appeal, however, this court found that they not only had jurisdiction to hear the appeal, but they reversed the district court and granted Officer Torres qualified immunity. They did that by focusing on the perspective of the shooting officer, Officer Torres. Officer Torres felt, and this court held that his feeling was reasonable, that Officer Key had been run over by the van driver and that the van driver was trying to do that again when he shot to prevent that from happening. Now, there was conflicting testimony there. A neighbor gave a declaration in which he called into question whether the van had ever struck Officer Key or whether the van was attempting to strike Officer Key a second time or was trying to avoid striking Officer Key. This court, and I think properly held, that despite the fact that that was a dispute over facts, that it wasn't a genuine issue of material fact, and they granted qualified immunity. I submit that that's exactly what happened here. You have Mr. Cananser, Phillip Cananser, on his porch. He attacked a police officer with a knife. He actually stabbed one of the police officers with a knife. And when he went to stab that police officer again, he was shot. Now, the district court denied qualified immunity based upon the testimony of neighbors.  But neither, and both neighbors admittedly described Phillip Cananser as not threatening to the officers. But that is controverted by objective evidence in the case. He actually stabbed one of the officers. So by definition, he was threatening to the officers. So in my view, that doesn't raise a genuine issue of material fact sufficient to defeat the summary judgment or the request for qualified immunity. It is just the district court making a mistake and adopting a fact pattern that can't be true. When I looked at the testimony that the neighbors gave, and I urge you to do it, it's a ---- I mean, there is a legitimate question as to whether or not the neighbors actually observed what they say they observed. I think they didn't. I think if you look at their ---- But how can we decide that? Because the objective evidence in the case shows that Phillip Cananser was a danger to the officers. He stabbed one of the officers. In other words, you're saying there's ---- it's undisputed that there was, because he had ---- I think there's a photograph of the knife wound. And so that it's clear that what they observed could not have been the whole thing. And they themselves admit that they're at an angle where they couldn't see everything and things of that sort, and that, therefore, the Wilkinson approach governs. That's exactly it. I mean, this is not a case where the neighbor saw the knife wound. They didn't see any of that. So this is not a case where they said, oh, we saw Phillip Cananser do this, and maybe he cut one of the officers. They didn't see that. One neighbor said, I think he had something in his hand, but I don't know what it was. He couldn't see it. The other neighbor said, well, I saw some things, and then when the things started happening, there were too many officers in front of her, and she didn't see anything at all. She didn't see the taser. She didn't see the pepper spray. She didn't really see anything. So when you are evaluating the officer's request for qualified immunity, you have to discount that. I mean, this is not a case where the neighbors are saying, where they saw the whole thing, and the neighbors are saying, no, he wasn't a threat, and the police are saying, yes, he was a threat. This is a case where, by definition, he was a threat because he stabbed one of them. Now. But even before you get to the stabbing, isn't there an assertion that the police set in motion a scenario that would ultimately lead to lethal consequences when it didn't have to be? What about the sergeant who set up the whole scenario, before you even get to the stabbing? I think there was a question as to whether or not the scenario that was set up by the sergeant on the scene was such that it ultimately led to a death provocation that didn't have to be, because he was told to come out of the house by the sergeant, and that's what really started the whole course of events that ended up in the death. So why isn't that a question of fact as to the whole scenario of events, not just the stabbing or the cutting of the one officer, but the entire spectrum of events? And I'm ready to talk about that Billington provocation issue, but before I leave this other issue, I want to make this point. Officer Smirga, one of the appellants here, is in a situation that is almost precisely the same as Officer Torres was in Wilkinson v. Torres. So just briefly, you know, he's the one who thinks the Filipino has stabbed his lieutenant. He thinks Filipino is coming at him again, so he shoots him to prevent that. That's just like Officer Torres who thinks Officer Keyes has been run over by the van and thinks the van is about to run over him again. So I just wanted to make that point. I think your argument is at a minimum there should be qualified immunity for that officer. Officer Smirga. Sorry. Officer Smirga. Turning to the provocation issue, and, you know, your case on provocation is the Billington case, Billington v. City of Boise case. You're familiar with the rule. The rule is, an otherwise constitutional use of force may be made unconstitutional if, in this case, pre-shooting conduct was also unconstitutional. So I think what you have to do when you look at it this way is you have to look at what the pre-shooting conduct was and why the police were there. And I think you need to examine, and I would ask you to examine, the 911 call. But that's what you're asking us to do, to look at the facts. That's the difficulty I have with your argument, is that the district court judge looked at all of that and said, you know, a jury needs to sort it out. I can't say that, you know, this was or was not reasonable on the part of the police. Well, I don't think that the district court judge did say there was a fact issue over whether Philip Knaxer was a danger to the officers, and that's why he denied qualified immunity. In fact, he said like two or three times in the opinion, if Philip Knaxer was a threat to the officers, if Philip Knaxer attacked the officers, then they have qualified immunity. But I submit, I can prove he attacked the officers. One of them got stabbed. You can prove it to a jury. That's the point. I think I can prove it the same way that in Wilkinson, Officer Torres proved that the van driver was a danger to his partner, and the same way that in Scott v. Harris, the officer proved. It's a close case. Close cases go to the jury. That's the point. You have an experienced district court judge who's saying these facts are not, are in dispute as to, you know, when he came out of the house, he was going back into the house. Was he retreating? Was he coming back out? It's just close. I'm having trouble finding what the dispute is over whether Philip Knaxer is a danger to the officers when he stabbed one of the officers. But, see, you're taking a snapshot at a certain point in time. But the district court judge is looking from the beginning to the shooting and saying, you know, in this whole spectrum of facts, there are material disputes. He can't just look at a snapshot and say he stabbed and he was shot and leave out everything else that happened before. I think that's the difficulty I'm having with your argument, that you're isolating part of the events. Well, I can talk about the other. I can talk about the other stuff. I have no doubt that you could. The issue is whether or not there's a material issue of fact that the district court saw and whether or not we should be first. We should say we have jurisdiction in view of the fact that the district court judge recognized a material issue of fact. That's my problem. All right. And I understand your problem. I understand the reason for the order. I the pre-shooting facts are not really in dispute. The 911 call is not really in dispute. The fact that Philip Conatra's mother called the police and said, look, my son is very violent. He's armed. He wants to die. He's going to make you shoot him. We're not talking about that. We're talking about what happened once the officers arrived at the scene. You're right. There's no question about the 911 call. There's no question about what the mother said when the police got there. No, that's undisputed. The disputed part is what happened after the police arrived on the scene and whether or not what happened after the police arrived on the scene indisputably showed that the decedent was a threat to the police officers. That's what the district court focused on. Well, it's all right. I think it's difficult to decide what the district court was really focusing on. I think, and so I'll make a couple of points. So if we can't decide that, how can we say there was no material issue of that? Just because the district court didn't focus on it doesn't mean it's a genuine issue of material fact. Look, there's no doubt that the police were out there for some period of time prior to when things started to happen. They were out there long enough to set up a perimeter. They were out there long enough that medical was on the scene. The fire department paramedics were on the scene. But there was the crisis intervention team wasn't called. No. Which is a little. Lieutenant Fennessy said there was no crisis intervention team available. That's not a disputed fact. So when everything started happening, it was four to eight seconds. Four to eight seconds. In four to eight seconds, the guy comes out. Go ahead. You look like you're going to ask me a question. I was going to say, that was really, that seems really a short estimate. When you look at everything that happened. But it's not disputed. I mean, the witnesses, I think one of the witnesses said six seconds. One of them said a few seconds. The officer said a few seconds. In that few seconds, Philip Knatzer came out screaming, shoot me with expletives. He then. And the inside of the house came back outside in four to eight seconds. All of that happened. That's. But nobody says anything different than that. And so when he comes back and he stabs Officer Fennessy. Now, look. Was it a stab or was it a cut? I mean, there's a difference between a stab and a cut. Well, it depends on what you think a stab is. Is a stab defined by the intent of the stabber or is it defined by the wound? No, it's defined by the nature of the wound. Well, if it's defined by the nature of the wound, then he didn't get stabbed. A stab is this way and a cut is that way. But he testified that the reason he didn't get stabbed is he backed up and put his hand up and that's why he got cut. When you say stab, it's much more dramatic than cut. And I probably. Well, for obvious reasons, I don't say cut. Yeah, yeah. The aptly. I know I don't have much time, but I want to make this one last point or I feel like I'll question myself when I leave. Okay. We wouldn't want you to question yourself. When you get down to, I think the appellees are apt to say that Lieutenant Phinnessy got injured in an accident that was maybe, I think the word they use, Philip Knautser flailing around because he had been pepper sprayed and it was a response to the pepper spray. In my view, if that were a dispositive issue for you, my response to that would be that's just speculation. It's speculation just like it was in Reynolds when the expert witness came in and said, hey, that guy probably moved because you were pushing your gun barrel at the back of his head. Well, I think the facts were that the pepper spray didn't really have any effect on him. It didn't. Right. There's not a doubt. He stabbed an officer. He cut an officer. There's not a doubt. He cut an officer. And before he could do that again, he was shot. Thank you, counsel. Thank you. We'll give you one minute for rebuttal. All right. All right. Good morning. May it please the Court. My name is E. Brent Bryson. Assisting me today is John Thayer Clark. We represent the appellees in this action. First and foremost, it's the appellee's position that this Court does not have jurisdiction to hear the appeal. So what do you say about Wilkinson? Well, when you talk about Wilkinson and you talk about Harris together, it's facts that are unbelievable that no reasonable trier of fact could accept as being true. And that's not the case here. That's what they want you to believe. And Judge Rawlinson kind of touched upon it. So you agree that even if the district judge said there were no – that there were genuine issues of disputed fact, if this Court were to determine that no reasonable jury could believe certain facts that are alleged by the party challenging the district court's – or, I'm sorry, appealing for the district court's decision, that we still would have jurisdiction? If – well, you would have jurisdiction to determine that there's not jurisdiction if you find that – No, no. I'm saying, supposing – maybe I didn't make my question very clear. If the district court says there are genuine issues of fact, in the old days, that is, before Scott, that be the end of the matter, we wouldn't have jurisdiction. Now, though, there's this question that as a result of the Supreme Court's decision in Scott, if an appellate court looking at the record says there really weren't disputed facts on material matters because no reasonable jury could decide the way that one side says it is in order to create a dispute, so we do have jurisdiction because it becomes now a question of law. We know what the real undisputed facts are, and therefore we have jurisdiction to determine the law. That seems to be what, at least my reading – Judge Sheehan can tell me if I'm wrong – of what was said in Scott – I mean, in Wilkinson. I would agree with that, except as a prerequisite, you have to examine the facts to make that leap, that there are no reasonable facts, therefore you have jurisdiction. So if we said, if we said we don't – the witness's story, the witness's stories don't really – they don't comport with the evidence. No jury would believe that, because actually the officer was cut, and therefore they can't say that he didn't pose a threat. And so why would that mean that we have jurisdiction? Because it goes to your analysis, Judge, where you said you can't take this in a snapshot. There are different periods of this event. Let me tell you some believable facts that were before the Court and I will place before you now that are clearly in the record. Mr. Cortez, the independent recipient witness, absolutely stated he could clearly see what was going on, there was a light pole there, and Philip never attacked the officers. That's E.O.R. – True. That can't be true, because one of the officers is cut. How can that be true? He is cut. The second time period is, was he a threat? When deadly force was used, was he a threat to the officers at that time? I just want to go through these facts real quick. Okay. Then I'll answer that. Cortez also did not hear any police warnings. Cortez says that he didn't see Philip as a threat at any time. Cortez, it happened all too fast. Verona, did not see Philip attack the officers, E.O.R. 275. Officer Shawarnix, this is the officer that's very close, didn't see anything in Philip's hands, E.O.R. 285, 286. Officer King, didn't see Philip raise his knife to stab the officers, E.O.R. 292. Smirga, when Philip comes up with his hands up, not armed, no threat, E.O.R. 344, 346. When Philip fights through the taser, Smirga doesn't see a weapon, E.O.R. 349. And – Wait a minute. Are you disputing that the officer received a cut? I'm not – So the fact that someone, even a fellow officer, didn't see the weapon that was used, the cut wasn't made, I'm willing to speculate, by a ghost or by a fingernail. So the fact that some of the officers didn't see the weapon, what's that matter if it's undisputed that he got cut? Because we have a complete time frame here, Judge, and there's really three periods that we need to focus on for purposes of this analysis. The first time period is when Philip is inside. Clearly, he's no threat to anyone when he's inside other than himself. His mother's been removed. They observed him. He's engaging in somewhat bizarre-type behavior, but he's not threatening anyone. And he is enclosed. The perimeter has been secured. He's going nowhere. That's inside. When he first comes out, there's nothing in his hands. He comes out, he jumps out, says, kill me, MFs, whatever the case may be. Nothing in his hand at that point. The first time that anyone sees that he has anything in his hands is after he's been shot with a beanbag, tased, and had a devastator put in his face. This is a mentally ill individual that at the time he comes out has committed no crime that they can talk about. He is not a threat, and I have the instances to the record when he first comes out. Cortez, Philip not a threat, EOR-269. King, didn't see a knife, EOR-269. But rather than focus on those facts, I can give those to you. I want to address what I think this Court's concern is. When he first comes out, his hands are up. There's nothing in his hands. He immediately gets hit with all of these nonlethal-type of weapons, which this Court has determined in de orally from the distance that they were used, quite frankly, there's a question as to whether they're nonlethal in the first place and whether they are continuing to escalate this guy up. You can't do that. They never took into consideration his mental illness at all. They had a dispatcher try to make contact. Although the representation was there was no CIT officers available, they never called to try to get one. And instead of having an experienced officer attempt to communicate with Philip, they had a rookie officer on his first day relaying important information, and the plan that this Lieutenant Fanese came up with, who says he responds twice a week to suicides, is I was going to have another officer command, and hopefully he would give up. After being there for 40 minutes, knowing that, absolutely knowing, having actual knowledge that this person was mentally ill, that's the plan that they came up with. So when Philip comes out with nothing, he gets hit with all these various things. He goes down. When he goes down, apparently he has a knife in his hands, or gets a knife when he's down. As he's coming up, he's being ---- Where did he get it from? Where did he get it from? There's a ---- it's not clear. It wasn't in his hands even according to the officer's testimony when he came out. His mother said he had a knife in the pocket, could have fallen out of his pocket, could have fallen out of his waistband. We don't know. That's another issue that needs to be cleared up. But anyways, when he's down, he gets the knife. He's coming up. Lieutenant Fanninze sprays him. In his deposition, Lieutenant Fanninze says that Philip then goes like this with his hands because he's being sprayed with this large devastator. Fanninze says it's so devastating that it puts a whole pack of dogs in the backyard and affects them, but apparently didn't bother Mr. Knatzer. So while his hands are like this, he's disoriented. There's a three-foot fence. He leans over and he's going like this. That's what the evidence says. And at that point, Lieutenant Fanninze gets a small cut. I don't diminish the fact that there was a risk there, a cut. Whether it's a cut or you cut your arm off, there's still a risk. But it's a small cut. It was treated and they put a Band-Aid over it. Now, that's the stabbing that we're talking about. Now, once the devastator's stopping, what does Philip do? He turns, he walks away, he's going back towards the house. We have Officer Smerga at that point saying that Philip is no longer a threat. Now, albeit, I will concede that perhaps at the time Philip is disoriented, flailing, they could have taken a shot if they wanted to and used deadly force at that point. I would say that that's at least theoretically arguable, that they be justified. At the point now he turns, goes away, walking back towards the house, he's no longer a threat, he is retreating. Deadly force at that point is not warranted. He's going back into a house or at least attempting to go back into a house where no one is in there, there are no firearms in there, where they had monitored him for about 30 minutes. As soon as he gets to the doorway, the evidence shows that he was shot with a .40 caliber, less lethal, again, from a distance and under Diorly, is certainly questionable whether it was really nonlethal. He turns, he takes a step forward, then he's shot with the live rounds. Now, that's the time period we need to focus on for the deadly force. The other stuff is past. So when they want to say that the facts are not there. Could you just get the microphone, please? Yes. We're not a jury. I apologize. What I'm saying is that's the time period you've got to focus on as for the use of the deadly force. So do we stay, stand here before you and say he never had a knife? Absolutely not. Do we stand here and say at the time that when he was shot with the lethal rounds, it is certainly in question whether or not he had a knife? I have all kinds of citations to the record for that. It's not clear. What is clear and what is admitted by the supervisor in charge is that no warnings were given. Again, under Diorly, if feasible, you should have warnings being given even if it's, in this case, a less lethal force. No warnings were given. The police say that they were given commands to Philip. There's a dispute whether commands were being given or not. The independent witnesses said they didn't hear any commands. So we have a dispute over the commands, whether they were given or not. We have an admission that no warnings were given. We have actual notice that the police understood that Philip was mentally ill. They certainly had time not only to deliberate but to formulate a plan being there for 30 to 45 minutes. And instead what they did was try to bait Mr. Knatzer outside with a phone call, using a dispatcher without knowing what training that dispatcher has, have him step outside. He immediately then gets shot after he makes one or two steps, testimony up in the air. No one sees a weapon at this point. He gets it with a taser twice. He gets it with a beanbag. He gets it at least once and probably twice. He gets it with a devastator. He stands up. He flails, has a knife in his hand, yes, no deadly shot there. He retreats, no threat anymore. He gets back to the house. He gets wound up again with a shot, turns, and is shot with deadly force. Now, that's the time periods that are relevant. So when he's – when counsel argues – When he's shot with deadly force, is he carrying the knife? It's unclear. It's in dispute. We have officers that are there saying no. And how many feet away is he from the officers? Approximately four to five, but there's a three-feet gate separating him, three-foot gate separating him from the officers also. The officers – But how far is he from the gate? It depends upon what testimony you believe. One step out the doorway would make him probably four – three to four feet from the gate. Or from the gate itself, not the gate door, which would be a little farther. Right. So those are the facts that we have, and those are certainly facts which a reasonable jury could infer. Number one, that, first of all, they – the police dishonored the teachings of this De Orley because it's the fact that he was mentally ill, and they knew that. They must – not should, not could. De Orley says you must consider that as a factor. Then they failed to give warnings, again, that this Court articulated. When you're dealing with a mentally ill person, if feasible, give a warning. No warnings. And dealing – and am I advocating that there's two separate standards for someone that's mentally ill and someone that is not?  No. But there are exceptions – but there are instances where the law absolutely does that. Let's talk about the insanity defense. Let's talk about diminished capacity in certain jurisdictions, and also heat of passion. So there is precedent that someone that's mentally ill should be treated slightly different. Is it a different standard? Do I say we have to have a constitutional standard for mentally ill and a constitutional standard for non-mentally ill? No. I do believe that this Court should clarify De Orley and come up with a rule that when you know or you've got reason to know that the person is mentally ill, that you should – there should be a rule that you should attempt to de-escalate the situation instead of escalate it. And if you have the ability to have trained CIT officers respond, then you should. And if you don't have CIT officers, then you should have your most experienced officers deal with this individual, not rookies, not dispatch people. And when – and time is on your side. That's what our expert says. That's what this Court said in Alexander. What's the rush? What's the hurry? They've been monitoring him for about 30 to 40 minutes. The – Alexander teaches us, as does the – my expert says time is on your side. Frequently, these type of psychotic episodes resolve themselves within time. There was no time. Everyone testifies that from the time Philip first stepped out until the time he was shot, it would be at least four to nine seconds, four to eight seconds. So they're saying that you have a mentally ill individual that should be capable of hearing commands if commands were given, and that's in dispute, understanding them and then comply within that time period. The only problem with that is during that same time period, everything else we've talked about happened. All the nonlethal shots, the lethal shots. So realistically, in order for commands to be effective, you have to have an opportunity to respond to the commands. Philip had no opportunity to respond to the commands. I mean that. All right, counsel. You've exceeded your time. Thank you for your argument. Thank you, Your Honor. Thank you. Rebuttal. Thank you, Your Honors. I only have a couple of points unless you have questions. I wanted to point out something that I failed to point out in my opening. When you look at that Scott v. Harris case, you look at the Wilkinson case. I think this is an important distinction. The test is no reasonable jury, not juror. So we're not trying to think if some juror could accept these facts. We're trying to decide if a jury would accept them in support of a verdict. So I wanted to make that point. The second point I wanted to make is that counsel seemed to suggest that the first time that Philip couldn't answer came at the officers and when Lieutenant Finnessy was cut, the deadly force would have been constitutional. But somehow it wasn't later. I want to point out that in that two to three second period of time, now he's assaulted a police officer with a deadly weapon. He's going to get arrested now. So even if you accept the fact that he wasn't a danger sometime prior to that or the cops didn't have any reason to be there, they have a reason to be there now. You know, and I think, I see I don't have any more time. I think if you look at Wilkinson and you look at the facts of this case and you look at whether there really is a genuine issue of material fact or whether these neighbors' testimony is just marginalized by the fact that they just didn't see it and they didn't see very important parts. Doesn't that go to the weight of their testimony as opposed to whether or not it raises an issue of fact? Well, if you look at Wilkinson, there was a neighbor who gave equivocal testimony in that, and the plaintiff, the family in that case, tried to use that neighbor's testimony to create this genuine issue of fact. Well, but that testimony was more shaky. I mean, it wasn't. Well. As you said, it was equivocal testimony. He said. This case was. These witnesses were not equivocal at all in their testimony. Well, they might have been very declarative in what they said, but they also were honest in admitting that they just didn't see everything. And I think if you read Valerie Varona's testimony, you've got to question whether she saw anything. If she didn't see things that we know happened. We know the police officer used a taser. We know the police officer used pepper spray. She didn't see any of that. But we know the vagaries of witness testimony are legion. So. But if you're going to demy these officers a very important offense of qualified immunity, I don't think it should be based on vagaries of witness testimony. I mean, in criminal cases even. I mean, people are allowed to testify. The descriptions differ. The accounts of events differ. That's just a factor of human nature. That doesn't mean that there is no material issue. It just means that the jury has to sort out, you know, which witnesses should be credited, which accounts should be credited. That's the whole purpose of a jury trial. I understand that. I understand that. And all I'm really trying to get you to do and to consider is whether these witnesses do present a fact issue that the court should have relied on or whether it was error to do so. All right. We understand your argument. Thank you to both counsel for your argument. The case just argued is submitted for decision by the court.
judges: Tashima, Rawlinson, Cjj Rakoff (S. New York), Dj